UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MACKLE VINCENT SHELTON,

      Petitioner,

v.                             Case No. 6:07-cv-839-Orl-35KRS

SECRETARY, DEPARTMENT
OF CORRECTIONS, et al.,

      Respondents.

_____

## UNOPPOSED BRIEF ON BEHALF OF *AMICI CURIAE*

**National Association of Criminal Defense Lawyers**
**Florida Association of Criminal Defense Lawyers**
**American Civil Liberties Union of Florida**
**Drug Policy Alliance**
**Calvert Institute for Policy Research**
**and**
**38 Professors of Law**[*]

## IN SUPPORT OF PETITIONER

_____

TODD FOSTER
COHEN, FOSTER & ROMAINE, P.A.
201 E. Kennedy Blvd., Suite 1000
Tampa, FL 33602
(813) 225-1655
*Counsel of Record*

DAVID OSCAR MARKUS
MARKUS & MARKUS
40 NW 3rd Street
PH 1, Suite 1101
Miami, FL 33128
(305) 379-6667
Vice Chair, Amicus Committee
National Association of Criminal
          Defense Lawyers

January 28, 2011

_____

[*] A complete list of law professor *Amici* appears at pages 5-6 of the brief.

*Of Counsel:*

Norman L. Reimer, Esq., Executive Director
National Association of Criminal Defense Lawyers (NACDL)
1660 L Street, NW 12th Floor
Washington, DC 20036
(202) 872-8600

Staff Counsel:

Quintin Chatman
Ivan J. Dominguez
Tiffany M. Joslyn
Jack King
Michael Price
Shana-Tara Regon

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... v

INTEREST OF *AMICI CURIAE* ...................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 7

PROCEDURAL BACKGROUND ......................................................................... 7

ARGUMENT ..................................................................................................... 8

I.    Florida's Strict Liability "Drug Abuse Prevention and Control" Law Is
Inconsistent with Supreme Court Jurisprudence and Is a Violation of the Due
Process Clause of the Fourteenth Amendment. .................................................. 8

    A.    The Florida Legislature's Express Removal of the Element of Mens Rea
for Violations of the Controlled Substance Law Is Sweeping and Nearly
Unprecedented in American Jurisprudence. ................................................ 8

    B.    The Florida Statute Is Unconstitutional Because the Harsh Penalties
Far Exceed the Strict Liability Offense Rubric of Supreme Court
Decisions or Common Law. ...................................................................... 11

        1.    A criminal offense that carries a substantial term of imprisonment and
does not require proof of a culpable mental state violates the due
process clause of the U.S. Constitution. ................................................. 12

        2.    The possession, sale or delivery of controlled substances is not a public
welfare offense. ..................................................................................... 14

        3.    The Florida law imposes an unreasonable duty in terms of a person's
responsibility to ascertain the relevant facts. ......................................... 16

II.    Elimination of the Mens Rea Element Is Atavistic and Repugnant to the
Common Law. .............................................................................................. 18

III.    Apart from the Fact that Florida's Statute Violates the Constitution and the
Fundamental Principles Underlying It, the Policy Is Irrational and Flawed. ........ 22

iii

IV. Mens Rea Is a Fundamental Component of Common Law Jurisdictions Around the World, of International Systems of Criminal Justice, and of Every International Human Rights Instrument that Guarantees the Right to a Fair Trial.................................................................................................25

**CONCLUSION** .................................................................................................29

**POSITION OF PARTIES**.................................................................................30

**CERTIFICATE OF SERVICE** .........................................................................31

# TABLE OF AUTHORITIES

**U.S. Constitution**

U.S. Const. amend. XIV ................................................................. 11

**Statutes**

Fla. Stat. § 775.012 ..................................................................... 10

Fla. Stat. § 775.084(4)(b) ............................................................. 10

Fla. Stat. § 893.101 ............................................................... 8, 9, 21

28 U.S.C. § 2254(d) ....................................................................... 7

1989 N.D. Sess. Laws Ch. 267, § 1 .................................................. 9

**Cases**

*Arutyuniantz v. Uzbekistan* (971/2001), ICCPR, A/60/40 vol. II (30 March 2005) 68 .... 28

*B. v. Dir. of Pub. Prosecutions*, (2000) 2 A.C. 428 ......................... 25

*Beaver v. R.*, (1957) S.C.R. 531 .................................................... 26

*Brend v. Wood*, (1946) 175 L.T.R. 306 ......................................... 25

*Chicone v. State*, 684 So. 2d 736 (Fla. 1996) ............................... 8, 9

*Harding v. Price*, (1948) 1 All E.R. 283 .......................................... 25

I/A Court H.R., *Case of García-Asto and Ramírez-Rojas v. Peru*, Judgment of Nov.

25, 2005, Series C, No. 137 ........................................................ 29

*Lambert v. California*, 355 U.S. 225 (1957) ...................... 17, 21, 23

*Liparota v. United States*, 471 U.S. 419 (1985) ............................. 14

*Mayer v. Marchant* (1973) 5 S.A.S.R. 567................................................................26

*Morissette v. United States*, 342 U.S. 246 (1952) ...........................................12, 13, 17

*Mullaney v. Wilber*, 421 U.S. 684 (1975)..............................................................9

*Nallaratnam v. Sri Lanka* (1033/2001), ICCPR, A/59/40 vol. II (21 July 2004) 246 .......28

*Patterson v. New York*, 432 U.S. 197 (1977) ......................................................9

*R. v. City of Sault Ste-Marie*, (1978) 2 S.C.R. 1299 .........................................26

*R. v. J.M.* (2010) 239 F.L.R. 49 .........................................................................26

*Salabiaku v. France* (1988) 13 EHRR 379 .......................................................28

*Scott v. State*, Slip Opinion No. SC94701 (Fla. 2002).......................................8

*Sherras v. de Rutzen*, (1895) 1 Q.B. 918 .........................................................25

*Staples v. United States*, 511 U.S. 600 (1994).................................................12, 13, 14

*State v. Bell*, 649 N.W.2d 243 (N.D. 2002)........................................................9

*State v. Bradshaw*, 152 Wash. 2d 529 (Wash. 2004) ........................................10

*State v. Brown*, 389 So. 2d 48, 51 (La. 1980) ..................................................17

*Sweet v. Parsley*, [1970] A.C. 132......................................................................25

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ................................14

*United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994)........................................14

*Vallance v R.* (1961) 108 C.L.R. 56....................................................................26

*Warner v. Metro. Police Comm'r*, (1969) 2 A.C. 256 ................................................25, 26

**Treaties and Conventions**

American Convention on Human Rights, Nov. 22, 1969, art. 8(2), 1144 U.N.T.S. 123.28

European Convention for the Protection of Human Rights and Fundamental

    Freedoms, Nov. 4, 1950, art. 6(2), 213 U.N.T.S. 222 ................................................ 27

International Covenant on Civil and Political Rights, Mar. 23, 1976, art. 14(2), 999

    U.N.T.S. 171 .......................................................................................................... 27

Rome Statute of the International Criminal Court, July 17, 1998, art. 30, 2187

    *U.N.T.S.* 90 ........................................................................................................ 26, 27

**Other Authorities**

Bacon, *Collection of Some Principle Rules and Maxims of the Common Law*, Reg.

    15 (1630) .............................................................................................................. 20

Black's Law Dictionary (rev. 9th ed. 2009) ................................................................. 22

4 William Blackstone, *Commentaries* *20-21 (1769). .................................................. 21

Bracton, *De Legibus et Consuetudinibus Angliae* (On the Laws and Customs of

    England) (ca. 1250) ............................................................................................. 20

Coke, *Third Institute* 6 (1641) ..................................................................................... 20

C. Peter Erlinder, *Mens Rea, Due Process, and the Supreme Court: Toward a*

    *Constitutional Doctrine of Substantive Criminal Law*, 9 Am. J. Crim. L. 163 (1981) .. 13

Oliver Wendell Holmes, *The Common Law* 4 (1881) .................................................. 18

Sanford H. Kadish, *Excusing Crime*, 75 Cal. L. Rev. 257 (1987) .................................. 24

Wayne R. LaFave, 1 Subst. Crim. L. § 5.5 (b) (2d ed. 2003) ....................................... 15

Laurie L. Levenson, *Good Faith Defenses: Reshaping Strict Liability Crimes*, 78

    Cornell L. Rev. 401 (1993) ................................................................................ 23, 24

Model Penal Code § 2.05, Comment (Tent. Draft No. 4, 1955)......................................24

Model Penal Code and Commentaries § 205 (1985) ......................................................16

Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup. Ct. Rev. 107....14, 22, 23

Michael P. Rosenthal, *Dangerous Drug Legislation in The United States:*

    *Recommendations and Comments*, 45 Tex. L. Rev. 1037 (1967) ..............................24

Francis B. Sayre, *Mens Rea*, 45 Harv. L. Rev. 974 (1932) ......................................19, 20

Francis B. Sayre, *Public Welfare Offenses*, 33 Colum. L. Rev. 55 (1933) ....................15

William A. Schabas, *Mens Rea and the International Criminal Tribunal for the*

    *Former Yugoslavia*, 37 NEW ENG. L. REV. 1015 (2003) .............................................27

Selden Society, *Select Pleas of the Crown*, No. 114 (1887) .........................................19

Richard Singer, *The Resurgence of Mens Rea: The Rise and Fall of Strict Criminal*

    *Liability*, 30 B.C. L. REV. 337 (1989) ........................................................................16

Richard Singer and Douglas Husak, *Of Innocence and Innocents: The Supreme*

    *Court and Mens Rea Since Herbert Packer*, 2 Buff. Crim. L. Rev. 850, 943 (1999)..14

Gerhard Werle & Florian Jessberger, *'Unless Otherwise Provided': Article 30 of the*

    *ICC Statute and the Mental Element of Crimes under International Criminal Law*, 3

    J. INT'L CRIM. JUST. 35 (2005)...................................................................................27

viii

## INTEREST OF *AMICI CURIAE*

### National Association of Criminal Defense Lawyers

The National Association of Criminal Defense Lawyers (NACDL) is a not-for-profit professional organization that represents the nation's criminal defense attorneys. NACDL is the preeminent organization advancing the institutional mission of the nation's criminal defense bar to ensure the proper and fair administration of justice, and justice and due process for all persons accused of crime. Founded in 1958, NACDL has a membership of more than 10,000 direct members and an additional 40,000 affiliate members in all 50 states and 28 nations. Its members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges committed to preserving fairness and promoting a rational and humane criminal justice system. The American Bar Association recognizes NACDL as an affiliate organization and accords it representation in the House of Delegates. In furtherance of its mission to safeguard the rights of the accused and champion fundamental constitutional rights, NACDL frequently appears as *amicus curiae* before the United States Supreme Court as well as before numerous federal and state court cases throughout the nation.

This case has profound consequences for accused persons in Florida and throughout the nation. It also has fundamental implications for our system of justice. In an order dated September 7, 2010, concerning a petition for writ of habeas corpus, U.S. District Court Judge Scriven announced that "the Court has determined that more information is necessary regarding claim one, in which Petitioner raises a

1

facial constitutional challenge to Florida's statutes prohibiting possession, sale, or delivery of a controlled substance, as they do not require the State to prove that a criminal defendant knew he possessed, sold, or delivered a controlled substance." The issue of the intent – or *mens rea* – requirement in the criminal law is one NACDL has recently addressed in an in-depth, joint study and report with The Heritage Foundation. *See* Brian W. Walsh and Tiffany M. Joslyn, The Heritage Foundation and National Association of Criminal Defense Lawyers, *Without Intent: How Congress Is Eroding the Intent Requirement in Federal Law* (2010), Report and Appendices *available at www.nacdl.org/withoutintent.* The report evidences concern across a broad ideological spectrum with the evisceration of traditional intent requirements.

### Florida Association of Criminal Defense Lawyers

The Florida Association of Criminal Defense Lawyers (FACDL) is a statewide organization representing over 1,500 members, all of whom are criminal defense practitioners. FACDL's unique body of real world experience and extraordinary depth and breadth of knowledge and training in the field of criminal law places it in a position to be of assistance to the Court in the disposition of the case at hand and in the consideration of its impact on cases in the future. As an organization whose members overwhelmingly represent Florida defendants, FACDL has a particular interest in the issue before the Court.

## American Civil Liberties Union of Florida

The ACLU is a nationwide nonpartisan organization of nearly 500,000 members dedicated to protecting the fundamental liberties and basic civil rights guaranteed by the state and federal Constitutions. The ACLU of Florida is its state affiliate and has approximately 25,000 members in the State of Florida also dedicated to the principles of liberty and equality embodied in the United States Constitution and the Florida Constitution. The ACLU and its affiliates, including the ACLU of Florida, have long been committed to protecting constitutional rights where criminal charges are involved. The ACLU of Florida has participated in several cases in Florida's courts on this score. *See, e.g., Stelmack v. State*, --- So. 3d ----, 2010 WL 4907468 (Fla. 2d DCA Dec. 3, 2010) (*amicus curiae* brief asserting First Amendment issues in application of criminal statute); *Hagopian v. Justice Admin. Comm'n*, 18 So. 3d 625 (Fla. 2d DCA 2009) (*amicus curiae* brief asserting interests of criminal defendant in involuntary appointment of counsel); *Limbaugh v. State*, 887 So. 2d 387 (Fla. 4th DCA 2004) (*amicus curiae* asserting right to privacy in medical records sought by State for criminal investigation); *State v. Shank*, 795 So. 2d 1067 (Fla. 4th DCA 2001) (statute which prohibited publications that tended to expose persons to hatred, contempt, or ridicule held to violate First Amendment – direct representation). *See also Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) (enjoining provisions of Child Online Protection Act on First Amendment grounds); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) (virtual child pornography;

3

ACLU participated as *amicus curiae*); *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) (enjoining provisions of Communications Decency Act on First Amendment grounds).

The proper resolution of this case is a matter of substantial concern to the ACLU of Florida.

## Drug Policy Alliance

The Drug Policy Alliance (DPA) is a national nonprofit organization that promotes policy alternatives to the drug war that are grounded in science, compassion, health and human rights. DPA's goal is to advance policies that reduce the harms of both drug misuse and drug prohibition, and seek solutions that promote safety while upholding the sovereignty of individuals over their own minds and bodies. DPA works to end drug policies predicated on arresting, convicting, incarcerating, disenfranchising and otherwise harming millions of non-violent people. To this end, DPA helped author and enact California's Proposition 36, the Substance Abuse and Crime Prevention Act of 2000, and has consistently opposed the imposition of punitive sanctions on low-level, non-violent drug law offenders as costly and counterproductive.

## Calvert Institute for Policy Research

The Calvert Institute for Policy Research, Inc. is a state level think-tank based in Baltimore that has published a number of papers and conference proceedings on criminal law and 'drug war' issues. It is concerned with the burden placed on court

and prison systems by over-criminalization of minor offenses, to the detriment of the ability of society to punish, prevent, and deter serious crimes of violence. It is based in a city in which jails and prisons function as schools for crime for an astonishing percentage of the youthful male population.

**Bridgette Baldwin, Western New England College School of Law, Springfield, MA; Ricardo J. Bascuas, University of Miami School of Law, Coral Gables, FL; Caroline Bettinger-López, University of Miami School of Law, Coral Gables, FL; Guyora Binder, University at Buffalo Law School, Buffalo, NY; Jennifer Blasser, Benjamin N. Cardozo School of Law, New York, NY; Vincent M. Bonventre, Albany Law School, Albany, NY; Tamar R. Birckhead, University of North Carolina School of Law, Chapel Hill, NC; Darryl K. Brown, University of Virginia School of Law, Charlottesville, VA; Paul Butler, The George Washington University Law School, Washington, DC; Michael Cahill, Brooklyn Law School, Brooklyn, NY; Matthew H. Charity, Western New England College School of Law, Springfield, MA; Lucian E. Dervan, Southern Illinois University School of Law, Carbondale, IL; William V. Dunlap, Quinnipiac University School of Law, Hamden, CT; Sally Frank, Drake University Law School, Des Moines, IA; Monroe H. Freedman, Hofstra University School of Law, Hempstead, NY; Bennett L. Gershman, Pace Law School, White Plains, NY; Andrew Horwitz, Roger Williams University School of Law, Bristol, RI; Babe Howell, CUNY School of Law, Flushing, NY; Renée Hutchins, University of Maryland School of Law, Baltimore, MD; John D. King, Washington & Lee University School of Law, Lexington, VA; Jeffrey L. Kirchmeier, CUNY School of Law, Flushing, NY; Richard Daniel Klein, Touro College Jacob D. Fuchsberg Law Center, Central Islip, NY; Kelly S. Knepper-Stephens, The George Washington University Law School, Washington, DC; Alex Kreit, Thomas Jefferson School of Law, San Diego, CA; Donna Hae Kyun Lee, CUNY School of Law, Flushing, NY; Mary A. Lynch, Albany Law School, Albany, NY; Dan Markel, Florida State University College of Law, Tallahassee, FL; Ellen S. Podgor, Stetson University College of Law, Gulfport, FL; Martha Rayner, Fordham University School of Law, New York, NY; Ira P. Robbins, American University Washington College of Law, Washington, DC; Jenny M. Roberts, American University Washington College of Law, Washington, DC; Ronald Rotunda, Chapman University School of Law, Orange, CA; Stephen A. Saltzburg, The George Washington University Law School, Washington, DC; William A. Schroeder, Southern Illinois University School of Law, Carbondale, IL; Michael L. Seigel, University of Florida Levin College of Law, Gainesville,**

**FL; Laurie Shanks, Albany Law School, Albany, NY; Rodney Uphoff, University of Missouri School of Law, Columbia, MO; Ellen C. Yaroshefsky, Benjamin N. Cardozo School of Law, New York, NY**

*Amici* are also 38 professors of law from across the United States. They sign this brief in their individual capacity as legal educators and not on behalf of any institution, group or association. Their sole purpose is a shared interest in the preservation of a fundamental principle of American criminal jurisprudence: the *mens rea* requirement. The professors believe Florida's wholesale elimination of a *mens rea* requirement in the statute prohibiting possession, sale, or delivery of a controlled substance violates the due process clause of the Fourteenth Amendment and is inconsistent with basic norms and principles underlying a just and fair legal system.

## SUMMARY OF ARGUMENT

A core principle of the American justice system is that no individual should be subjected to condemnation and prolonged deprivation of liberty unless he acts with a criminal intent. The essential nexus between a culpable mental state and the wrongful act provides a moral underpinning for criminal law that predates the founding of the United States and is constitutionally compelled in any circumstance in which a significant penalty may be imposed. While NACDL and many others are concerned about the gradual dilution of *mens rea* requirements, Florida's evisceration of an intent requirement for the possession, sale or delivery of controlled substances takes this trend to an unprecedented extreme. In so doing, Florida Statute § 893.13 violates the due process provisions of the United States Constitution. This extraordinary departure from traditional notions of justice for crimes that carry harsh punishment, up to and including life imprisonment, also departs from the core underpinnings of the American justice system and international norms.

## PROCEDURAL BACKGROUND

*Amici* support the view that the denial of Petitioner's federal Constitutional claim by the Florida courts is not entitled to deference because no state court fully and fairly adjudicated the claim on its merits. *See* Pet. Br. at 20-22. Nonetheless, even if this Court applies the deferential standard articulated in 28 U.S.C. § 2254(d) (2010), the Florida statute is contrary to established Supreme Court precedent and

is an unreasonable application of federal law. *See* Pet. Br. at 23-25. *Amici* focus on this latter point in sections I and II. If deference is not due, however, then the question is simply whether the Florida law is constitutional. Relevant to that determination are Supreme Court precedent (section I), the common law, public policy, and international law (sections II, III and IV).

## ARGUMENT

**FLORIDA STATUTE § 893.13 (AS AMENDED BY § 893.101) IS UNCONSTITUTIONAL ON ITS FACE AND CONTRARY TO PUBLIC POLICY, CENTURIES OF COMMON LAW TRADITION AND INTERNATIONAL LEGAL NORMS.**

I. **Florida's Strict Liability "Drug Abuse Prevention and Control" Law Is Inconsistent with Supreme Court Jurisprudence and Is a Violation of the Due Process Clause of the Fourteenth Amendment.**

A. The Florida Legislature's Express Removal of the Element of Mens Rea for Violations of the Controlled Substance Law Is Sweeping and Nearly Unprecedented in American Jurisprudence.

Florida's statutes prohibiting the possession, sale, or delivery of a controlled substance do not require the State to prove that a defendant knew she possessed, sold, or delivered a controlled substance. *See* Fla. Stat. § 893.101 (May 13, 2002). The Florida Legislature expressly enacted § 893.101 in response to two Florida Supreme Court decisions involving simple possession:

(1) The Legislature finds that the cases of *Scott v. State*, Slip Opinion No. SC94701 (Fla. 2002) and *Chicone v. State*, 684 So. 2d 736 (Fla. 1996) holding that the state must prove that the defendant knew of the illicit nature of a controlled substance found in his or her actual or constructive possession, were contrary to legislative intent.

(2) The Legislature finds that knowledge of the illicit nature of a controlled

8

substance is not an element of any offense under this Chapter....

Fla. Stat. § 893.101. In expressly removing the *mens rea* requirement, the Florida legislature made clear its intent "to make criminals out of people who were wholly ignorant of the offending characteristics of items in their possession, and subject them to lengthy prison terms[.]...render[ing] criminal a mail carrier's unknowing delivery of a package which contained cocaine[.]" *See Chicone*, 684 So. 2d at 743. Indeed, the jury in this case was instructed that "to prove the crime of delivery of cocaine, the state must prove the following two elements beyond a reasonable doubt: that Mackle Vincent Shelton delivered a certain substance; and, that the substance was cocaine." (Tr. at 338). This application is also reflected in the changes to the Florida Standard Jury Instructions following the enactment of § 893.101.[1]

In its September 7, 2010 Order, this Court observed that only the states of North Dakota and Washington have felony drug statutes that eliminate any *mens rea* requirement. In 1989, however, North Dakota's legislature abandoned that strict liability regime in favor of a "willfully" requirement. *See State v. Bell*, 649 N.W.2d 243, 252 (N.D. 2002) (*citing* 1989 N.D. Sess. Laws Ch. 267, § 1). Washington

---

[1] The statute's provision for an affirmative defense for lack of knowledge does not solve the constitutional problem here. A state may not constitutionally presume the *mens rea* element of a crime. *See Patterson v. New York*, 432 U.S. 197, 215 (1977) ("*Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense.... Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause." (*citing Mullaney v. Wilber*, 421 U.S. 684 (1975)).

9

State[2] and Florida, then, are the only two states that have strict liability felony drug laws, and Florida law is unique in providing a potential term of life imprisonment. In this case, the Petitioner was eligible for 30 years, and sentenced to 18 years, under this strict liability offense.[3]

So sweeping is Florida's elimination of the *mens rea* requirement for this offense that it patently contravenes the stated "General Purposes" of the entire Florida Criminal Code. Those purposes include "giv[ing] fair warning to the people of the state in understandable language of the nature of the conduct proscribed and of the sentences authorized upon conviction[,]" "defin[ing] clearly the material elements constituting an offense and the accompanying state of mind or criminal intent required for that offense[,]" and "safeguard[ing] conduct that is without fault or legitimate state interest from being condemned as criminal." Fla. Stat. § 775.012 (2)-(3), (5). Of course, since no *mens rea* at all is required, the "fair warning" purpose described in the Florida Code is meaningless, as this component of due process cannot be met under a law which criminalizes the wholly innocent conduct of, for example, a Federal Express employee delivering a mailed package

---

[2] The penalty for violating the Washington State statute is not more than ten years imprisonment. A 2004 challenge to that law in the Supreme Court of Washington was found to have failed to squarely raise the Constitutional Due Process claim at issue here. *See State v. Bradshaw*, 152 Wash. 2d 529, 539 (Wash. 2004). In addition, the underlying legislative facts in Washington are distinct. There, the state legislature did not explicitly abrogate the intent requirement. Instead, it was inferred by the Court to have done so implicitly by not added *mens rea* language in any of several revisions of the law over the years. *Id.* at 535.

[3] The draconian penalties provided for in the statute here go further and implicate mandatory minimums in the context of a habitual offender in Florida. *See* Fla. Stat. § 775.084(4)(b).

containing a controlled substance. Likewise, in enacting such a strict liability criminal law, the State of Florida has not only failed to "safeguard" innocent conduct, it permits law enforcement to target it.

Ultimately, the State can point to no authority that would permit a Legislature's wholesale elimination of *mens rea* requirements in the criminal law. The omission of any *mens rea* element runs counter to core principles of justice found in the common law and enshrined by the due process clause of the United States Constitution. U.S. Const. amend. XIV. And yet, the Florida legislature did precisely that to chapter 893 of its criminal code treating the possession, sale or delivery of controlled substances. If the State prevails and this Court finds constitutional a strict liability *malum prohibitum* statute under which draconian prison sentences are available, there is nothing to prevent legislatures from undertaking a sweeping, wholesale elimination of any *mens rea* requirements in their criminal law.

B.   The Florida Statute Is Unconstitutional Because the Harsh Penalties Far Exceed the Strict Liability Offense Rubric of Supreme Court Decisions or Common Law.

To whatever limited extent the Supreme Court has permitted strict criminal liability, the scope of the Florida statute and the resulting penalties far exceed the constitutional limits. The imposition of an 18-year sentence, without requiring proof of a culpable mental state, offends fundamental notions of justice.

1.    *A criminal offense that carries a substantial term of imprisonment and does not require proof of a culpable mental state violates the due process clause of the U.S. Constitution.*

The Supreme Court has held that, as a general matter, the penalties imposed for public welfare offenses for which the imposition of strict liability is permitted "commonly are relatively small, and conviction does not grave damage to an offender's reputation." *Morissette v. United States*, 342 U.S. 246, 256 (1952). The Court in *Morissette* was clear about why the imposition of strict liability in the criminal law is traditionally disfavored:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Id.* at 250-51 (citations omitted).

In *Staples v. United States*, 511 U.S. 600 (1994), the Court suggested that felony-level punishment for a strict liability offense would be unconstitutional. "Close adherence to the early cases ... might suggest that punishing a violation as a felony is simply incompatible with the theory of the public welfare offense. In this view, absent a clear statement from Congress that *mens rea* is not required, we should not apply the public welfare rationale to interpret any statute defining a felony offense as dispensing with *mens rea*." *Id.* at 618. In *Staples*, the Court found that

12

the National Firearms Act's prohibition against possession of an unregistered machinegun was silent as to the required *mens rea*, but was not an offense of a "public welfare" or "regulatory" nature sufficient for the Court to infer that Congress intended to entirely dispense with a *mens rea* requirement. *Id.* While insisting that its holding is a narrow one, the Court nevertheless also invoked the potential ten-year sentence under the provision of the Firearms Act at issue in its analysis to hold that "to obtain a conviction, the Government should have been required to prove that petitioner knew of the features of his AR-15 that brought it within the scope of the act." *Id. Staples* declined to establish a bright-line rule concerning the relationship between the duration of the potential incarceration under a criminal statute and the availability of strict liability as an option for the legislature. *Id.* at 619-20 ("'Neither this court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not.'" (*quoting Morissette*, 342 U.S. at 260)). One can certainly speculate as to how the Court would rule if a legislature explicitly adopted a statute that established a *malum prohibitum* offense with no culpable mental state and that provided severe penalties. But such speculation based on dicta does not trump the constitutional limits on strict liability offenses established by *Morissette* and its progeny.[4]

---

[4] Scholars and commentators have long recognized the Constitutional dimension of the *mens rea* element in the criminal law. *See* C. Peter Erlinder, *Mens Rea, Due Process, and the Supreme Court: Toward a Constitutional Doctrine of Substantive Criminal Law*, 9 Am. J. Crim. L. 163, 175 & 191

Furthermore, early in the term following *Staples,* the Supreme Court decided against strict liability in a case under the Protection of Children Against Sexual Exploitation Act, another case in which a ten-year sentence was possible. *United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994). "*Staples'* concern with harsh penalties looms equally large respecting [18 U.S.C.] § 2252: Violations are punishable by up to 10 years in prison as well as substantial fines and forfeiture." *Id.* at 72, 78 (holding that "the term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers"). In the instant case, the Florida legislature has made clear that Florida's felony drug law is strict liability in nature. And, as explained above, the penalty available under that law can be as severe as life imprisonment.

> 2.  *The possession, sale or delivery of controlled substances is not a public welfare offense.*

Strict liability offenses arose with the need for regulation of the Industrial Revolution.  The early strict liability offenses, called public welfare offenses,

---

(1981); Richard Singer and Douglas Husak, *Of Innocence and Innocents: The Supreme Court and Mens Rea Since Herbert Packer,* 2 Buff. Crim. L. Rev. 850, 943 (1999); Herbert L. Packer, *Mens Rea and the Supreme Court,* 1962 Sup. Ct. Rev. 107 ("Mens Rea is an important requirement, but it is not a constitutional requirement, except sometimes."). As a result, courts often interpret ostensibly strict liability statutes using the doctrine of constitutional avoidance, reading a *mens rea* requirement into criminal laws that are silent or unclear as to that element of the offense in order to avoid declaring them unconstitutional. This practice reveals the underlying common law and constitutional grounding of the *mens rea* element of criminal offenses. Even under Professor Herbert's rubric, "sometimes" certainly must embrace a potential life sentence. *See, e.g., Staples v. United States,* 511 U.S. 600, 605 (1994) ("'[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.'" (*quoting United States v. United States Gypsum Co.,* 438 U.S. 422, 436 (1978))); *Liparota v. United States,* 471 U.S. 419, 426 (1985) (finding that ambiguity concerning the *mens rea* of criminal statutes should be resolved in favor of lenity, and emphasizing

imposed duties on individuals connected with certain industries that affected public health and welfare. Included within the public welfare offenses category are the illegal sale of alcoholic beverages, sale of impure or unadulterated food, violations of traffic regulations and motor vehicle laws, and sale of misbranded articles. *See* Francis B. Sayre, *Public Welfare Offenses*, 33 Colum. L. Rev. 55, 73 (1933). Wayne LaFave identifies the following three arenas in which there is some authority "to the effect that a strict-liability criminal statute is unconstitutional if (1) the subject matter of the statute does not place it 'in a narrow class of public welfare offenses,' (2) the statute carries a substantial penalty of imprisonment, or (3) the statute imposes an unreasonable duty in terms of a person's responsibility to ascertain the relevant facts." Wayne R. LaFave, 1 Subst. Crim. L. § 5.5 (b) (2d ed. 2003) (citing several state supreme court decisions) (citations omitted). In this case, the Petitioner is faced with a statute that imposes both a substantial penalty of imprisonment – 18 years – and an unreasonable duty in terms of a person's responsibility to ascertain the relevant facts.

For public welfare offenses, the prosecution need only prove that an illegal act occurred. Justifications for strict liability in the context of public welfare offenses include (1) deterring businesses from ignoring the well-being of consumers; (2) having to prove *mens rea* would further burden courts that are already overburdened; and (3) imposing strict liability is acceptable because the penalties

---

that "[t]his construction is particularly appropriate where, as here, to interpret the statute otherwise

involved in public welfare offenses are small and there is little social stigma. *See* Richard G. Singer, *The Resurgence of Mens Rea: The Rise and Fall of Strict Criminal Liability*, 30 B.C. L. Rev. 337, 389 (1989).

These justifications, however, are not valid when applied to eliminating the *mens rea* element for the possession, sale or delivery of controlled substances. "[T]he actual enforcement of strict liability statutes in the public welfare realm...has increasingly become based upon some kind of *mens rea*." *Id.* at 392. Moreover, the position that strict liability is desirable because it is efficient fails to note that "courts often look to mens rea in assessing the penalty to be imposed" and if they fail to make such an inquiry, "the solution is not to distort the criminal process, but to label such offenses by some other nomenclature." *Id.* This latter viewpoint is evident in the Model Penal Code. Model Penal Code and Commentaries § 205 (1985). While public welfare offenses generally carry small monetary fines, drug possession, sale or delivery offenses, as in Petitioner Shelton's case, can carry penalties that are quite severe. An 18-year sentence should not be imposed without an accompanying determination that Mr. Shelton had the intent to commit the crime with which he was charged.

3.   *The Florida law imposes an unreasonable duty in terms of a person's responsibility to ascertain the relevant facts.*

Finally, the duty imposed on individuals by Florida's controlled substance law as a strict liability statute is inherently unreasonable. In 1980, the Louisiana

---

would be to criminalize a broad range of apparently innocent conduct").

Supreme Court faced the question of the constitutionality of the Louisiana controlled substance law's express language permitting the prosecution of possessory offenses even where the accused only "unknowingly" possessed the offending substance. That court, applying the U.S. Supreme Court's decision in *Morissette*, held that drug possession could not be a strict liability crime, as it "requires little imagination to visualize a situation in which a third party hands the controlled substance to an unknowing individual who then can be charged with and subsequently convicted for violation of [this law] without ever being aware of the nature of the substance he was given." *State v. Brown*, 389 So. 2d 48, 51 (La. 1980) (finding that such a "crime" offends the conscience and concluding that "the 'unknowing' possession of a dangerous drug cannot be made criminal").

Florida's strict liability felony drug laws are, in the context of the unreasonable duty analysis, much like the strict liability Los Angeles felon registration ordinance. In that case, the Supreme Court ruled that the Los Angeles strict liability ordinance was unconstitutional because the lack of a *mens rea* requirement rendered it a violation of Constitutional due process protections. *Lambert v. California*, 355 U.S. 225, 228-29 (1957) (while announcing that there is "wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition[,]" the Court held that would not extend to "wholly passive" conduct, such as the failure to register). Wholly passive, innocent, or no conduct whatsoever, though, is precisely what the state of Florida has permitted to be targeted by the

17

stripping of any *mens rea* requirement at all from its controlled substance law.

The absence of Supreme Court precedent marking a clear and unambiguous line dividing constitutional from unconstitutional strict liability offenses provides no sanctuary for Florida's strict liability felony drug laws. There is such a line. And wherever that line precisely exists, there can be no doubt that Florida's law is squarely on the unconstitutional side.

## II.    Elimination of the Mens Rea Element Is Atavistic and Repugnant to the Common Law.

Florida's attempt to strip the requirement of a culpable mental state from some of the most serious offenses known to the law violates well-established principles that predate the adoption of the American Constitution and would return to principles not seen in the English common law antecedents of the American justice system since medieval times. The element of *mens rea* evolved in the common law to distinguish criminal culpability from accident and trespass. More than a century ago, the American jurist Oliver Wendell Holmes wrote, "I do not know any very satisfactory evidence that a man was generally held liable either in Rome or England for the accidental consequences even of his own act." Holmes, *The Common Law* 4 (1881).

Justice Holmes, however, did not peer far enough back into the Dark Ages. Indeed, under early Anglo-Saxon law a man was liable for every homicide he committed, whether intended or not intended (*voluns aut nolens*), unless committed under the king's warrant or in pursuit of justice (trial by combat).

18

"What the recorded fragments of early law seem to show is that a criminal intent was not always essential for criminality and many malefactors were convicted on proof of causation without proof of any intent to harm." Francis B. Sayre, *Mens Rea*, 45 Harv. L. Rev. 974, 976-82 (1932). Sayre traces the origins of *mens rea* in English common law to two influences: the rediscovery of Roman law, resuscitated in the universities across Europe, and an increasing influence of canon law, which emphasized *moral* guilt. The Roman notions of *dolus* (evil intent) and *culpa* (fault) were experiencing a secular revival (and attempts were made to graft them into English common law), while at the same time, the church's measurement of magnitude of sins depended largely on the penitent's state of mind. Under canon law, the mental element was the real criterion of guilt, and the concept of subjective blameworthiness as the foundation of legal guilt was making itself felt. "Small wonder then that our earliest reference to *mens rea* in an English law book is a scrap copied in from the teachings of the church," Sayre observed. *Id.* at 983.

By the 13th Century, culpability was becoming entwined with evil intent (*dolus*) or the lack thereof. Cases were brought in which the penalty for felony (death) seemed unwarranted or repugnant to the jury, and were referred to the king for pardon. In 1203, a case was noted in which "Robert of Herthale, arrested for having in self-defense slain Roger, Swein's son, who had slain five men in a fit of madness, is committed to the sheriff that he may be in custody as before, for the king must be consulted about this matter." Selden Society, *Select Pleas of the*

*Crown*, No. 114 (1887) (cited in Sayre, *Mens Rea*, *supra*, at 980, n.17).

By the early 17th Century, *mens rea* had become so firmly established in England as an element of murder and some lesser crimes, such as knowingly possessing stolen goods (without the evil mind, possession of stolen goods was a civil offense),[5] that Sir Edward Coke memorialized the maxim, "*Actus non facit reum nisi mens sit rea.*" Coke, *Third Institute* 6 (1641) ("the act does not make a person guilty unless the mind be also guilty"). Likewise, Lord Bacon wrote in his own *Maxims*, "All crimes have their conception in a corrupt intent, and have their consummation and issuing in some particular fact." Bacon, *Collection of Some Principle Rules and Maxims of the Common Law*, Reg. 15 (1630) ("*In criminalibus sufficit generalis malitia intentionis cum facto parus gradus*").

The early English colonists brought the key concepts of *actus reus* and *mens rea* to the New World. More than a century later, when it became necessary for the American people to dissolve the political bonds which connected them with their fellow Englishmen across the sea, the common book in virtually every courthouse and law office from Massachusetts to Georgia was William Blackstone's *Commentaries*.

---

[5] Indeed, the use of *mens rea* to help distinguish the felony of larceny from civil trespass began to emerge a century earlier. Bracton, who wrote and edited the treatise *De Legibus et Consuetinibus Angliae* (On the Laws and Customs of England) (ca. 1250), borrowing heavily from Roman law, laid down *animus furandi* (literally, "intent to steal") as one of the requisites of the felony of larceny. Sayre, *Mens Rea*, 45 HARV. L. REV. 974, 999 (1932). Henry of Bratton (c. 1210-1268), (known as Bracton) was a clergyman and judge on the *coram rege*, later known as the King's Bench, from 1247-50 and 1253-57.

Blackstone summarized the importance of the *mens rea* element in the criminal laws of England and the Colonies just seven years before American independence:

> . . . Indeed, to make a complete crime, cognizable by human laws, there must be both a will and an act. . . . And, as a vicious will without a vicious act is no civil crime, so on the other hand, an unwarrantable act without a vicious will is no crime at all. So that to constitute a crime against human laws, there must be, first, a vicious will; and, secondly, an unlawful act consequent upon such vicious will.

4 William Blackstone, *Commentaries* *20-21 (1769).

Ignorance or mistake of fact was also a proper plea rendering a harmful act non-criminal, according to law when this country was founded. As unknowing possession of stolen goods was only civilly actionable in Coke's England, Blackstone summarized the law as exempting ignorance of a significant fact (as opposed to ignorance of the law) from criminal liability:

> [I]gnorance or mistake is another defect of will; when a man, intending to do a lawful act, does that which is unlawful. For here deed and the will acting separately, there is not that conjunction between them, which is necessary to form a criminal act. But this must be an ignorance or mistake of fact, and not an error in point of law.

*Id.* at 27; *see Lambert*, 355 U.S. at 229-30. Similarly, unknowing possession or delivery of a controlled substance, without "vicious will" or under mistake of fact does not "form a criminal act."

The legislature's removal of the element of *mens rea* from § 893 of the Florida Criminal Law is not only an atavistic throwback to the barbarism of the Dark Ages, it is repugnant to the civilized common law as understood by American

21

lawyers in 1776 and the nation's founders in 1787.

### III. Apart from the Fact that Florida's Statute Violates the Constitution and the Fundamental Principles Underlying It, the Policy Is Irrational and Flawed.

The inclusion of *mens rea* requirements in criminal offenses serves the broad purpose of deterrence in the criminal justice system while acting as a safety valve against criminal punishment for innocent actors. Deterrence of criminal conduct cannot be achieved in a system that punishes those who are not culpable. Black's Law Dictionary defines deterrence as "[t]he act or process of discouraging certain behavior, particularly by fear; esp., as a goal of criminal law, the prevention of criminal behavior by fear of punishment." Black's Law Dictionary (rev. 9th ed. 2009). But strict liability "is inefficacious because conduct unaccompanied by an awareness of the factors making it criminal does not mark the actor as one who needs to be subjected to punishment in order to deter him or others from behaving similarly in the future[.]" Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup. Ct. Rev. 107, 109. If a person is unaware of the conduct in which he is engaged, the risk of criminal punishment simply cannot affect, let alone prevent, his engagement in that conduct.

Strict liability does not deter accidental or unknowing conduct, and it puts innocent actors at risk of unjust criminal conviction and punishment by eliminating any distinction between innocent, lawful conduct and that which is criminal. Under the statute at issue here, people can be criminally convicted if, without their

22

knowledge, another person slips a bag of drugs into their shoulder bag, backpack, or coat pocket. Perfectly innocent conduct, such as riding public transit at rush hour or setting one's bag down at a coffeeshop, can result in multiple years of incarceration and the life-long label of convicted felon. Such a situation "is unjust because the actor is subjected to the stigma of a criminal conviction without being morally blameworthy." *Id.* This problem is not resolved by the Florida statute's provision allowing for an affirmative defense, as that, on its face, effects a shifting of the presumption of innocence – a bedrock Constitutional principle – to one of guilt.

Strict liability means no excuses, no exceptions, and certainly no consideration of one's good faith. "In ignoring the defendant's intent, the strict liability doctrine even allows for punishment of individuals who, because of deception, unwittingly commit prohibited acts." Laurie L. Levenson, *Good Faith Defenses: Reshaping Strict Liability Crimes*, 78 Cornell L. Rev. 401, 402-403 (1993). While ignorance of the law traditionally does not preclude criminal punishment, *but see Lambert*, 355 U.S. at 229-30, surely complete ignorance of any and all facts constituting the offense should preclude criminal punishment. Otherwise, innocent actors engaging in normal, everyday conduct are undoubtedly at risk of criminal prosecution and punishment.

These points of criticism have been echoed throughout the legal profession for decades. "Strict liability offenses have been widely criticized on the ground that dispensing with proof of purpose, knowledge, recklessness, and even negligence,

they permit the punishment of persons who are not blameworthy, who do not require 're-education,' and who could not have been deterred." Michael P. Rosenthal, *Dangerous Drug Legislation in The United States: Recommendations and Comments*, 45 Tex. L. Rev. 1037, 1134-35 (1967) (internal citations omitted). Commenting on strict liability in 1955, the Reporters of the Model Penal Code wrote:

> The liabilities are indefensible in principle, unless reduced to terms that insulate conviction from the type of moral condemnation that is and ought to be implicit when a sentence of imprisonment may be imposed. In the absence of minimal culpability, the law has neither a deterrent nor corrective nor an incapacitative function to perform.

Model Penal Code § 2.05, Comment (Tent. Draft No. 4, 1955). The words of those Reporters ring true decades later. Strict liability drug offenses in no way deter criminal conduct and instead only increase the risk that innocent actors will be unjustly punished.

The Florida legislature's removal of a *mens rea* requirement from drug offenses forces the imposition of criminal liability without any proof of culpability. "Commenting on the imposition of liability without regard to the defendant's state of mind, Professor Kadish stated, 'If a principle is at work here, it is the principle of tough luck.'" Levenson at 403 (quoting Sanford H. Kadish, *Excusing Crime*, 75 Cal. L. Rev. 257, 267 (1987) (internal quotation marks omitted)). Our criminal justice system cannot operate on such a principle, especially here, where these strict liability drug offenses carry sentences of decades and the felony brand of second-class citizenship. Allowing this scheme to stay in place is ineffective at best and

unjust at worst.

**IV. Mens Rea Is a Fundamental Component of Common Law Jurisdictions Around the World, of International Systems of Criminal Justice, and of Every International Human Rights Instrument that Guarantees the Right to a Fair Trial.**

Florida's elimination of the *mens rea* requirement is outside the norms of international legal systems and principles generally embraced by the United States. Most domestic legal systems outside of the United States treat the concept of *mens rea* as a presumption, requiring proof of guilty intent or knowledge as an element of any criminal offense. In the United Kingdom, for example, *mens rea* has been an essential element in every common law crime for centuries. *See Warner v. Metro. Police Comm'r*, (1969) 2 A.C. 256, 276; *Harding v. Price*, (1948) 1 All E.R. 283, 284; *Brend v. Wood*, (1946) 175 L.T.R. 306, 307. Where statutory crimes make no mention of *mens rea*, there is a well-established presumption that some evil intention or knowledge of the wrongfulness of the act is required to sustain a conviction in the absence of clear legislative intent to the contrary. *B. v. Dir. of Pub. Prosecutions*, (2000) 2 A.C. 428, 443; *Sherras v. de Rutzen*, (1895) 1 Q.B. 918, 922. This is especially true for serious or "truly criminal" offenses as opposed to "quasi-criminal" offenses under public health, licensing, and industrial legislation. *Sweet v. Parsley*, [1970] A.C. 132, 148-149 (quashing a drug-related conviction because the statute in question created a serious, or "truly criminal" offense, that did not require the prosecution to prove *mens rea* but instead shifted the burden to the defendant to convince the jury that he was innocent of any criminal intention);

25

*Warner*, 2 A.C. at 278. Indeed, the House of Lords has been so loath to "give effect to a proposition which is so repugnant to all principles of criminal law in this kingdom" that when it confronted unmistakable legislative intent to make drug possession a strict liability offense, the Lords turned their attention to the meaning of "possession" and held that it was impossible to "possess" something of which one is unaware. *Id.* at 276.

Similarly, in *Beaver v. R.*, [1957] S.C.R. 531, the Supreme Court of Canada, considered legislation criminalizing the possession of drugs in terms almost identical to the British law at issue in *Warner*. The Court refused to allow the defendant's conviction to stand, holding that: "[t]he essence of the crime is the possession of the forbidden substance and in a criminal case there is in law no possession without knowledge of the character of the forbidden substance." *Id.*; *see also R. v. City of Sault Ste-Marie*, (1978) 2 S.C.R. 1299, 1311 (finding that absolute liability in criminal law offends the principles of fundamental justice). Australia has taken a similar approach to *mens rea* and absolute liability. *See R. v. J.M.* (2010) 239 F.L.R. 49, 59-60; *Mayer v. Marchant* (1973) 5 S.A.S.R. 567, 585; *Vallance v. R.* (1961) 108 C.L.R. 56, 78-79.

Much the same can be said about modern systems of international criminal justice. Article 30 of the Rome Statute of the International Criminal Court (ICC) codifies a default *mens rea* requirement for all crimes under international law, mandating that "a person shall be criminally responsible and liable for punishment

for a crime ... only if the material elements are committed with intent and knowledge." Rome Statute of the International Criminal Court, July 17, 1998, art. 30, 2187 U.N.T.S. 90, 107. Some crimes, such as those related to command responsibility, may expand liability to include mere recklessness or negligence, but the concept of criminal strict liability is "unknown to international law." Gerhard Werle & Florian Jessberger, *'Unless Otherwise Provided': Article 30 of the ICC Statute and the Mental Element of Crimes under International Criminal Law*, 3 J. Int'l Crim. Just. 35, 46-7; 36 n.2 (2005). For example, despite lacking an analog to Article 30, the Nuremberg Charter, the Statutes of the International Criminal Tribunal for Yugoslavia (ICTY) and Rwanda (ICTR), and the Statute of the International Court of Justice (ICJ) have all been read to require some degree of *mens rea* for crimes within their jurisdiction. *See* William A. Schabas, *Mens Rea and the International Criminal Tribunal for the Former Yugoslavia*, 37 New Eng. L. Rev. 1015, 1015 (2003); Werle & Jessberger, at 36-7.

Finally, international human rights treaties such as the International Covenant on Civil and Political Rights (ICCPR), the European Convention on Human Rights (ECHR), and the American Convention on Human Rights (ACHR) all recognize that strict or absolute liability in the criminal context is a violation of the right to a fair trial. All three instruments guarantee the right to a fair trial, which includes the presumption of innocence. International Covenant on Civil and Political Rights, Mar. 23, 1976, art. 14(2), 999 U.N.T.S. 171, 174; European Convention for the Protection

of Human Rights and Fundamental Freedoms, Nov. 4, 1950, art. 6(2), 213 U.N.T.S. 222, 228; American Convention on Human Rights, Nov. 22, 1969, art. 8(2), 1144 U.N.T.S. 123, 147.

Under these conventions, strict or absolute liability offenses offend the right to a fair trial by creating a presumption or reverse onus on the defendant to prove his innocent intent. This infringes on the presumption of innocence because it allows a defendant to be convicted as a result of failing to meet this persuasive burden, which is properly borne by the prosecution. In such a situation, the prosecution may successfully obtain a conviction while also failing to prove all the elements of the offense beyond a reasonable doubt. The result – conviction despite reasonable doubt – is a violation of every international human rights instrument that guarantees the right to a fair trial. *See, e.g., Salabiaku v. France* (1988) 13 EHRR 379, 388 at paras. 28-30 (finding that the ECHR prohibits presumptions of fact or law that fail to recognize and maintain the rights of the defense and suggesting that the French law at issue would violate the Convention if judges were not free to disregard the offending presumption); *Arutyuniantz v. Uzbekistan* (971/2001), ICCPR, A/60/40 vol. II (30 March 2005) 68 at para. 6.4 ("[B]y reason of the principle of presumption of innocence, the burden of proof for any criminal charge is on the prosecution, and the accused must have the benefit of the doubt. His guilt cannot be presumed until the charge has been proved beyond a reasonable doubt.") (citing Human Rights Committee, General Comment No. 13); *Nallaratnam v. Sri Lanka*

(1033/2001), ICCPR, A/59/40 vol. II (21 July 2004) 246 at para. 7.4 (finding a violation of Article 14(2) where the burden was on the defendant to prove that his confession was not voluntary); I/A Court H.R., *Case of García-Asto and Ramírez-Rojas v. Peru*, Judgment of Nov. 25, 2005, Series C, No. 137, para. 160 ("[T]he principle of presumption of innocence is a tenet of fair trial ... When presuming the guilt of [the defendant] and requesting, in turn, that [he] show his innocence, the State violated the right to presumption of innocence as enshrined in Article 8(2) of the Convention.").

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that the Court invalidate Florida Statute § 893.13 pursuant to the due process clause of the United States Constitution.

Respectfully submitted,

TODD FOSTER
Florida Bar No. 0325198
Cohen, Foster & Romine, P.A.
201 E. Kennedy Blvd., Suite 1000
Tampa, FL 33602
Phone: (813) 225-1655
Fax: (813) 225-1921
tfoster@tampalawfirm.com
*Counsel of Record*

January 28, 2011

29

## POSITION OF PARTIES

On January 24, 2011, NACDL Executive Director Norman L. Reimer spoke with Assistant Attorney General Carmen Corrente, who has authorized counsel to represent that he consents to the filing of this amicus brief, including as respects its oversized length. Petitioner's counsel also consents to the filing of this amicus brief.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of January, 2011, I have electronically

filed the foregoing with the Clerk of the Court which will send a notice of electronic

filing to:

Carmen F. Corrente
Office of the Attorney General
Carmen.corrente@myfloridalegal.com

James E. Felman
jfelman@kmf-law.com
Katherine Earle Yanes
kyanes@kmf-law.com
KYNES, MARKMAN & FELMAN, P.A.

TODD FOSTER
*Counsel of Record*